**Maria J. SANTIAGO-SANTIAGO, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.**

**Civ. No. 90-1440 (JAF).**

United States District Court, D. Puerto Rico.

Feb. 5, 1991.

Juan A. Hernandez–Rivera, Raymond Rivera–Esteves, San Juan, P.R., for plaintiff.

Jose Vazquez–Garcia, Asst. U.S. Atty., Daniel F. Lopez–Romo, U.S. Atty., Samuel C. Fish, Asst. Regional Counsel, Dept. Health & Human Services, Boston, Mass., for defendant.

**REMAND ORDER**

FUSTE, District Judge.

This is an action under section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health and Human Services (the "Secretary") denying plaintiff's application for disability benefits. Because we find that the Secretary's decision is not based on substantial evidence, we REMAND for further proceedings.

Claimant Maria de Jesus Santiago–Santiago filed an application for disability bene-

---

fits on August 19, 1988, alleging an inability to work since February 15, 1988. The claimant has been insured for purposes of the Act since the alleged onset date, and will continue to meet insured status through at least December 31, 1992. The application was denied initially and on reconsideration. The matter went to an administrative hearing, which resulted in a November 29, 1989 finding of not disabled. The Appeals Council denied the plaintiff's request for review on March 12, 1990, rendering the ALJ's determination a final administrative decision ripe for our review.

## Discussion

Claimant was born on August 18, 1948. She has a 12th grade education and a relevant past work history as a nurse's aide. She considers herself to be disabled because of a combination of factors that include a bad back, an injured right hand, and "sinus bradycardia", a condition which she claims results in biweekly dizzy spells and falls. The ALJ applied the five-step sequential analysis as prescribed by the Secretary. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Goodermote v. Secretary of Health and Human Services*, 690 F.2d 5 (1st Cir.1982). We have no quarrel with the ALJ's disposition of the first four steps. The ALJ found that the claimant has not been employed since the alleged onset date (step one); that the claimant has a severe degenerative joint disease, a moderate impairment in fingering and handling in her right hand, and a mild limitation in bending (step two); but that no combination of her impairments is listed or medically equivalent to the conditions listed in Appendix 1, Subpt. P, 20 C.F.R. Part 404 (step three); and that exertional limitations alone would preclude the claimant's ability to perform her past relevant work (step four).

In his analysis, the ALJ found that the claimant's exertional limitations limited her Residual Functional Capacity (RFC) to light work, defined as the ability to work except for walking or standing for more than six hours in an eight hour day, lifting or carrying over 20 pounds at a time, with frequent lifting and carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567.

The ALJ's findings as to claimant's back condition is fully supported in the record. The degenerative joint disease in the back results in some limitation in movement of the spine, which limits the claimant's ability to engage in certain postural activities such as climbing or stooping (Tr. 154). One diagnosis was of L5 root lesion (Tr. 151). Another generally described a lumbosacral strain (Tr. 115). One radiographic report of the lumbosacral spine indicated only minimal changes (Tr. 145). Another showed no evidence of osseous or joint pathology (Tr. 137). Two RFC's were filed, both agreeing that claimant had some limitations due to her conditions, but that as to her ability to stand/walk, and lift/carry, she retained the capacity to perform light work.

Presumably on that basis, the ALJ found that the claimant could perform the full range of light work. This conclusion is unsupported by the very RFC's themselves, in that it fails to account for the specific effect that claimant's hand limitations would have on certain types of light work.

## Hand Injury

Plaintiff's right hand limitations are well documented in the file (Tr. 102, 126, 129, 142). The condition, right ulnar nerve palsy (Tr. 142), the result of a childhood accident, results in a contraction of the 4–5 fingers. Claimant testified, and the medical record shows, that she can only stretch these fingers out by applying force (Tr. 141). Her treating physician described the condition as a "paralysis of RT ulnar and ulnar side of the RT hand" (Tr. 127). Claimant testified, and the record supports the point, that the injury results in weakness in the right hand (Tr. 141). The hand is atrophied (Tr. 102). Residual weakness from the nerve damage is described (Tr. 151).

Both RFC's in the record specifically refer to claimant's right-hand condition as providing a significant limitation on certain types of handling and fingering. The RFC

filed by Dr. Marxuach states that there is "major loss of function [illegible] moderate impairment for handling & fingering" (Tr. 93). A second RFC concurs in this assessment (Tr. 98).

The record clearly describes an individual whose manual dexterity in her right hand is significantly limited. The ALJ himself refers to the "moderate impairment" in fingering and handling (Tr. 14). Despite all that, the ALJ determines that the claimant retains the capacity to perform sustained gainful employment as a "garment folder", "sorter turner", or "garment bagger".

We do not believe that merely because Social Security cases involve a forest of regulations, reams of medical data, and the solemn testimony of esteemed experts, we are obliged to dispense with common sense. A person who must use her left hand to open the fingers of her right hand cannot be expected to perform work the very essence of which requires *bilateral manual dexterity*. The Secretary's own regulations specifically state that a permanent injury of the right hand may limit the range of work to jobs where bilateral manual dexterity is not necessary. 20 C.F.R. Part 404, Subpt. P, App. 2, § 201.00(h) (forbidding use of GRID where hand injury limits work capacity even within "sedentary" range). All three jobs suggested by the vocational expert in this case are described in his testimony (Tr. 43–44). All three are performed at work tables, and all three seem to us to require the use of both hands. We do not need an expert to tell us that an employer who hires a "garment folder" will require that person to make multiple, accurate, uniform folds at a very high rate of speed for hours at a stretch.

We do note that the vocational expert did not ignore the hand condition completely in his testimony. He considered it relevant when opining that the claimant could not perform her prior relevant work, due to its effect on her ability to lift. However, he makes no reference to the hand in his assessment of the three jobs that he says claimant could perform. We do not think the finding of suitability for these highly hand-oriented jobs is saved by the passing observation by the vocational expert that the claimant was able to use her right hand to "pinch" with her thumb and index fingers. Without more description of the jobs suggested, we have to assume that merely being able to "pinch" would not be adequate to fulfill the requirements of the jobs suggested. Nothing stated by the vocational expert is inconsistent with that assumption. If anything, one cryptic exchange during cross-examination would support the proposition that the hand limitation would preclude the performance of the jobs outlined:

Q [Claimant's Attorney] If we took into consideration that even though she can pinch, she alleges that she has no strengthing [sic] ability in those fingers. That is, she has lost her strength in her first three fingers and is losing the strength in her other fingers. Could she perform these jobs if she doesn't have the strength?

A [Vocational Expert] The limitation of strength in that arm does not impede her from simple grabbing, pushing, pulling or fine manipulation. Being this her skilled hand, [sic] I understand that she could not perform these tasks.

Transcript at 44.

If the vocational expert took the claimant's hand condition into account at all, then, he was making a quasi-medical determination as to what level and types of bilateral manual activity claimant could perform. The RFC's and other medical evidence indicate some significant limitations in the hand, yet the ALJ accepted a vocational expert's suggestion of jobs requiring manual dexterity. The ALJ makes no explanation as to why the medical evidence should not be given what seems a facially obvious interpretation, namely that the claimant's serious hand condition makes her an unlikely candidate for jobs requiring a high level of manual dexterity. Where a result conflicts with logic, an explanation is due. None is supplied here.

We note that the First Circuit has on occasion remanded a matter to the Secretary where the ALJ's finding of residual

functional capacity seems to be inconsistent with the medical evidence, and no medically prepared RFC exists in the file which would help the ALJ to interpret the medical evidence. *Rivera–Figueroa v. Secretary of Health and Human Services*, 858 F.2d 48 (1st Cir.1988); *Rivera–Torres v. Secretary of Health and Human Services*, 837 F.2d 4, 6–7 (1st Cir.1988); *Berrios v. Secretary of Health and Human Services*, 796 F.2d 574, 576 (1st Cir.1986). The Circuit in those cases cautioned against lay fact finders interpreting raw medical data. We believe that this case is a variation on that theme. Here, although there were two medically prepared RFC's which referred to significant limitations in the right hand, neither explains what the effect of the limitations might be on the claimant's ability to perform tasks requiring bilateral manual dexterity. We think that a medical expert opinion on that specific issue is necessary. We do not think that the ALJ or the vocational expert possess the knowledge to determine, on the basis of seeing the claimant "pinch" her fingers at the hearing, what kind of manual manipulation function is retained by the claimant. We believe it necessary for a medical expert to describe the range of manual manipulation available to the claimant in detail, along with an assessment of the length of time which claimant could be expected to perform such movements. Only a medical expert will be able to properly assess the fatigue factor as it relates to the constant and repeated use of the atrophied limb. Once the record is properly developed as to medical assessments of claimant's digital capabilities, a new vocational assessment consistent with such abilities can be made.

### Dizzy Spells

We are also troubled by the ALJ's apparent dismissal of claimant's allegations of repeated dizzy spells as a factor. The reference to dizzy spells is frequent in the record (Tr. 110, 115, 121, 131, 191, 195). One medical examination was actually interfered with due to dizziness (Tr. 115). The claimant testified that her dizziness comes frequently, and that it sometimes causes her to fall down (Tr. 39). The medical evidence is almost uniform in diagnosing sinus bradycardia, (Tr. 110, 115, 121, 124, 131, 135 193), which is defined as "sinus rhythm at a rate of less than 60 beats per minute." Gould Medical Dictionary (3rd Ed.1972). The record indicates that the dizziness complaints are consistent with the diagnosed condition (Tr. 131, 191). The vocational expert testified that if the dizziness condition exists as alleged, the claimant would not be able to perform tasks in a sustained manner (Tr. 45).

We believe that dizziness is analogous to pain. *Avery v. Secretary of Health and Human Services*, 797 F.2d 19 (1st Cir.1986) (evaluation of pain explained). Like pain, allegations of dizziness which derives from some medically definable source can be divided into two basic categories: 1) dizziness that derives from an "objective" source, in that there exists a verifiable medical condition which would explain and be consistent with the level dizziness complained of, and 2) dizziness that derives from an "objective" source, but is more severe than would be expected from the existent medical condition. As to the latter, the ALJ is faced with a credibility determination, since there is no way to verify subjective complaints of dizziness which go beyond what is medically "verifiable". It is well-settled as to pain that although the ALJ must consider the subjective complaints which at least arise from some medically verifiable source, the ALJ has great latitude in rejecting purely subjective complaints which the ALJ finds not to be credible. *Avery, supra; Winn v. Heckler*, 762 F.2d 180 (1st Cir.1985).

As to the former situation, however, where the complaints are determined by medical evidence to be perfectly consistent with existent medical conditions, (and therefore not "subjective") the ALJ cannot substitute his own interpretation of the evidence for that of the medical experts. In the case at bar, the ALJ's only mention of dizziness is a passing reference to one of claimant's dizziness episodes. The ALJ then ignores the condition through the remainder of the opinion. If the ALJ had relied on some medically based evidence

that the dizziness did not occur or that the level of dizziness complained of would not be consistent with claimant's objectively verifiable condition, we could leave it to the ALJ to resolve any conflicts in the evidence. *Rodriguez v. Secretary of Health and Human Services*, 893 F.2d 401 (1st Cir.1989) (claimant's complaint of dizziness not credible based on medical evidence). In this case, however, the ALJ makes no attempt to explain the complaints of dizziness at all. All medical evidence in the file supports that the dizziness exists due to an objective condition (sinus bradycardia). No medical evidence in the record contradicts the claimants' assertions of dizziness, yet the ALJ ignores them. We cannot find on such facts that the ALJ's decision is supported by substantial evidence.

### Conclusion

This matter is remanded to the Secretary. The Secretary will obtain a detailed medical opinion as to the specific effect that claimant's hand injury would have on her ability to perform bilateral manual tasks. In addition, the opinion shall consider claimant's ability to perform such tasks, if at all, for the sustained periods that would correspond to a work environment. In other words, the Secretary will obtain a medical opinion not only as to claimant's general ability to perform a given task, but her ability to perform the task in a rapid, repetitive manner, so that the Secretary will have the benefit of medical expert testimony as to the potential effect of a fatigue factor on the injured limb at issue here. The opinion shall be sought from a medical expert who has examined claimant's hand personally.

In addition, the Secretary shall obtain a medical determination as to the severity of claimant's dizzy spells and the effect on her ability to perform tasks similar to those required in a work environment. The opinion may be obtained from a medical expert who has examined claimant, or who has reviewed the file in this case.

In both instances, the information which we order the Secretary to seek is in the nature of a medically prepared RFC. How-

ever, the RFC form is too general to obtain the necessary information. We leave it to the Secretary to determine in what form such information might be most useful. Whether the Secretary wishes to hold a hearing with a medical expert to inquire as to the issues, or whether the Secretary wishes to propound a short set of interrogatory questions in the nature of a hand-tailored RFC to obtain the information, we leave to the Secretary's discretion. Naturally, the claimant must be afforded the opportunity to submit her own further evidence on these issues. This matter is REMANDED to the Secretary for further action not inconsistent with this opinion.

IT IS SO ORDERED.